**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **AVANTAX WEALTH MANAGEMENT, INC., f/k/a H.D. VEST, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 3:21-cv-00810** |
| **MARRIOTT HOTEL SERVICES, INC. d/b/a GAYLORD OPRYLAND RESORT & CONVENTION CENTER,** | ) | **JUDGE CAMPBELL** |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

Pursuant to Fed. R. Civ. P. 15 and the agreement of the parties, Plaintiff, Avantax Wealth Management, Inc., f/k/a H.D. Vest, Inc. (hereinafter, "Avantax"), respectfully files this First Amended Complaint for Declaratory Judgment against Defendant Marriott Hotel Services, Inc., d/b/a Gaylord Opryland Resort and Convention Center (hereinafter, "Gaylord Opryland").

## INTRODUCTION

1. This lawsuit relates to a contract (the "Agreement") that Avantax and Gaylord Opryland entered into on March 31, 2019, whereby Gaylord Opryland agreed to host a conference for Avantax from June 18, 2021, through June 24, 2021 (the "Annual Conference"). The Annual Conference was to take place at the Gaylord Opryland Resort & Convention Center in Nashville, Tennessee (the "Resort"), and was intended to bring together more than 1,000 Avantax employees and others from across the United States. A copy of the Agreement is attached as Exhibit A.

2. Beginning in 2020 and continuing through 2021, state and local governments enacted mandates and restrictions relating to in-person gatherings in response to the COVID-19

pandemic (the "Pandemic"). In Nashville, the Metro Public Health Department ("MPHD") and the city government enacted restrictions that prohibited gatherings of the size and nature that was contemplated in the Agreement. The restrictions were imposed through various Orders that were, according to the terms of the Orders, to be enforced through "civil and criminal penalties." The Orders did not expire upon set dates, but were instead, by their terms, to "remain in effect until . . . rescinded, superseded, or amended."

3. Despite the Pandemic and the ongoing restrictions imposed by the MPHD, the Parties continued to work together in good faith to prepare for the Annual Conference, through the beginning of March 2021. However, on March 10, 2021, the MPHD sent a letter to Gaylord Opryland and other "Hospitality Industry Partners" outlining its expectations regarding the restrictions it had imposed relating to gatherings at venues including the Resort (the "MPHD Letter"). The letter provided that the MPHD expected that the relevant restrictions were expected to remain in place in Nashville through July 1, 2021. On March 15, 2021, a Gaylord Opryland sales executives sent a copy of the MPHD Letter to Avantax.

4. At the time the Parties received the MPHD Letter, it was apparent that the Annual Conference, as planned, would have been illegal under the referenced Orders. Gaylord Opryland acknowledged that fact both directly and indirectly, as it attempted to convince Avantax to hold a smaller event at its facilities in lieu of the larger Annual Conference provided for in the Agreement. On March 23, 2021, based upon the restrictions imposed by the MPHD and upon the information made available the MPHD Letter, Avantax sent Gaylord Opryland written notice that it was terminating the Parties' Agreement pursuant to the Force Majeure provision contained in the contract.

5. Over a month after Avantax's cancellation of the Annual Conference and

termination of the Agreement, on April 27, 2021, the MPHD lifted the restrictions on gatherings that would have made the Annual Conference illegal. Despite the fact that those changes were not and could not have been reasonably anticipated by either Party at the time Avantax sent the written notice of termination, Gaylord Opryland has taken the position that Avantax's termination for cause under the Force Majeure provision was invalid because it turned out that the Annual Conference was not "impossible," on the date on the event was scheduled to occur. For several reasons, Gaylord Opryland's position is inconsistent with Tennessee law and with the plain language of the Agreement.

6. Therefore, Avantax has filed this action seeking a declaratory judgment as to the Parties' rights and obligations under the Agreement. Avantax respectfully requests that a judgment be entered in its favor, declaring that Avantax acted within its rights in terminating the Agreement, that Gaylord Opryland is not entitled to any costs, fees, or other damages relating to that termination, and awarding such additional and/or alternative relief as appropriate under the Agreement and as justice may require.

**PARTIES, JURISDICTION, AND VENUE**

7. Plaintiff, Avantax, is a Texas Corporation with its principal place of business at 3200 Olympus Blvd., Suite 100, Dallas, Texas 75019-5889. Avantax is a resident of the State of Texas.

8. Defendant Marriott Hotel Services, Inc. is a Delaware corporation. Marriott Hotel Services, Inc. maintains its principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817-1102. Marriott Hotel Services, Inc. may be served through its registered agent, C T Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

9. Defendant Marriott Hotel Services, Inc. conducts business as and through the

Gaylord Opryland Resort & Convention Center, which is located at 2800 Opryland Drive, Nashville, TN 37214.

10. Defendant Marriott Hotel Services, Inc. is the party authorized to enter into contracts of the type and nature at issue in this lawsuit on behalf of Gaylord Opryland. Defendant Marriott Hotel Services, Inc. is a party to the Agreement, and all persons involved in negotiating, executing, and communicating with Avantax about the Agreement on behalf of Gaylord Opryland were, at all relevant times, employees and/or agents of Marriott Hotel Services, Inc.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000.

12. Venue is proper in this Court because the contract at issue, the Agreement, contemplated an event that was scheduled to occur, in its entirety, at Gaylord Opryland's facilities located within the Middle District of Tennessee, and because the performance of the contract was to occur primarily in the Middle District of Tennessee.

## FACTS

13. Avantax is a financial services firm that provides wealth management services. Avantax Wealth Management works with a nationwide network of approximately 3,500 financial professionals that operate as independent contractors. Avantax is a subsidiary of Blucora, Inc.

14. Gaylord Opryland is a resort and convention center in Nashville, Tennessee. It is advertised to be a "one-of-a-kind resort," with over 2,700 guest rooms, 176 suites, and over 750,000 square feet of "flexible meeting space" contained within "9 acres of airy, indoor garden atriums." The Resort boasts "a wide selection of award-winning restaurants & bars, the world-class Relâche Spa, and a state-of-the-art fitness center," as well as Nashville's "premier aquatic attraction," SoundWaves.

15. Each year, Avantax hosts an annual conference for its financial professionals and other employees. The annual Avantax conference is the largest conference event that Avantax holds for its financial professionals each year. Through its annual conference, Avantax endeavors to provide a first-rate event in order to facilitate an in-person opportunity for learning and collaboration amongst hundreds of its professionals who work across the country. In addition to typical conference meetings, the event typically also includes celebratory gatherings where alcohol is served, such as awards banquets.

16. Avantax decided to book its 2021 annual conference with Gaylord Opryland based upon its ability to provide the event spaces, guest accommodations, and amenities that Gaylord Opryland advertises and that, during normal times, are readily available to its customers.

17. The Parties entered into the Agreement on March 31, 2019. The Agreement was signed by the then-President of HD Vest, Inc.,[1] Scott Rawlins, on March 28, 2019. Katie Collins, a Senior Sales Executive, signed on behalf of Gaylord Opryland on March 31, 2019. The Agreement expressly provided that the signing of the Agreement by a representative of HD Vest, Inc. constituted an "offer," and that the agreement was "accepted" and "executed," and became binding on the Parties, upon the signing by Ms. Collins (as the representative of Gaylord Opryland).

18. The Agreement provides for guaranteed room accommodations, amenities to all attendees, and reserved space for planned meetings and social functions. The Agreement also addresses guest room rates, food and beverage expenditures, and other special financial incentives.

19. With regard to room accommodations, the Agreement contemplated the Annual Conference's attendees occupying a total of over 1,000 rooms each night from June 21, 2021

[1] Subsequent to the signing of the Agreement, HD Vest, Inc. became Avantax Wealth Management, Inc.

through June 23, 2021. The agreement also provided for a smaller number of reserved rooms between June 18, 2021 and June 20, 2021, and on June 24, 2021. The Agreement contemplated that 1,200 people would be in attendance.

20. A "prevailing daily resort fee" was to be added to the guest room rate. That fee was to cover several guaranteed amenities including, but not limited to:

- Daily scheduled shuttle service to the Grand Ole Opry House, Opry Mills, General Jackson Showboat, and the Inn at Opryland;
- Fitness Center access;
- Gaylord Spring Golf Links practice range access; and
- Wildhorse Saloon cover charge for up to 4 guests.

21. With regard to the "Program," which was the primary purpose of the Annual Conference, the Agreement provides that Gaylord Opryland had "reserved space for your meeting and social functions, as set forth in the attached Program Schedule attached hereto and incorporated herein."

22. The Agreement sets forth, in detail, the planned schedule for the Annual Conference, with conference rooms, offices, and meeting spaces identified for each block of time over the six-day period during which the event was to occur. The Agreement expressly provides that the "Theatre" in the Delta A section of the Resort would be generally available for up to 1,200 attendees on five of the six days of the Annual Conference. The Agreement also expressly provides that ten other "Theatre" rooms would be available at various locations in the Resort, and that each Theatre will be capable of accommodating between 100 and 300 attendees at a time. The Agreement states that Gaylord Opryland had "blocked a minimum of 83,287 gross square feet of [the] Ryman Exhibit Hall" in connection with the Annual Conference.

23. The Agreement provides for the availability of food and beverages, including alcoholic beverages, to all attendees throughout their stay at the Hotel. The Agreement includes provisions for full bar service and incentives in the event that bar sales exceeded certain thresholds. The Agreement requires a minimum food and beverage expenditure of $575,000 by Avantax.

24. The Agreement provided that in the event of a cancellation without cause, Avantax was to be required to pay certain fees based upon the timing of the cancellation, the total anticipated room revenue, and the food and beverage minimum (the "Cancellation Clause").

25. The Agreement also contains a Force Majeure provision that states, in its entirety:

> Either party may be excused from performance without liability if *circumstances beyond its reasonable control*, such as acts of God, war, acts of domestic terrorism, strikes or *similar circumstances*, make it illegal or impossible to provide or use the Hotel facilities. The ability to terminate pursuant to this clause is conditioned upon delivery written notice to the other party setting forth the basis for such termination within ten (10) days after learning such basis.

(emphasis added).

26. The Agreement expressly provided that it is "subject to all applicable federal, state, and local laws, including health and safety codes, alcoholic beverage control laws, disability laws, federal anti-terrorism laws and regulations, and the like." The Agreement required that Gaylord Opryland and Avantax "cooperate with each other to ensure compliance with such laws."

27. Beginning in early 2020, it became public knowledge that COVID-19 had or would eventually spread into virtually every corner of the world. On March 4, 2020, the first case of COVID-l9 in Tennessee was identified. A significant number of additional cases followed, presenting a serious risk to the health, safety, and welfare of Tennesseans and those visiting the state.

28. The World Health Organization declared COVID-19 a pandemic on March 11, 2020. The next day, the Governor of Tennessee issued an Executive Order declaring a State of Emergency, and the Mayor of Nashville issued a request to postpone all large gatherings. On March 13, 2020, a national emergency was declared in the United States.

29. In the days that followed, various federal and state regulations and executive orders restricted travel as well as large gatherings and events—especially indoors. In Tennessee, Governor Lee issued Guidance for Mass Gatherings on March 13, 2020, "strongly discourage[ing] events of 250 people or more as an important step in limiting exposure to COVID-19."

30. The MPHD also entered multiple Orders addressing the Pandemic and imposing restrictions on gatherings throughout Davidson County. The MPHD has continued to update the Orders and the restrictions imposed. In addition, throughout the relevant period, the MPHD, through the Interim Chief Medical Director of Health for Nashville and Davidson County, Dr. Gill C. Wright, III, who also signed the referenced Orders, provided periodic updates regarding anticipated amendments and updates, including updates regarding the anticipated duration of the restrictions that had been imposed.

31. On February 27, 2021, the MPHD released its Seventh Amended and Restated Order 12 from the Interim Chief Medical Director addressing the "Phase Three Reopening," which was signed by Dr. Wright ("Order 12"). Section 1 of Order 12 provided, in part, that:

> Crowd sizes of more than 8 people indoors or 25 outdoors are prohibited, except for places of worship and as otherwise specified in this Order. These prohibitions apply to any event or convening that brings together groups of individuals, including but not limited to community, civic or sporting events; parades, concerts, festivals, conventions, fundraisers, private gatherings and similar activities.

32. Section 4 of Order 12 provided, in part, that:

> An Individual, entity, or organization that is a food service establishment as defined in T.C.A. § 68-14-703(9) that holds a license issued by the Tennessee ABC, an on-premise beer permit, or allows the consumption of alcohol on premises may operate at up to the number of patrons that may be seated in compliance with CDC guidance on social distancing between parties, not to exceed 125 patrons per floor and 100 patrons outdoors. Enclosed outdoors space shall be considered part of the building's adjacent floor, and the patrons in such space included in calculating whether the establishment has exceeded the maximum number of patrons allowed on that floor.

33. Section 7 of Order 12 provided for the possibility of "community, civic or sporting events; parades, concerts, festivals, conventions, fundraisers, private gatherings and similar activities" of up to 1,000 people. In order to hold such an event, "whether held on private property or at venues, businesses, or facilities for rent or open to the public," the "[o]perators, organizers, sponsors or hosts must file a written plan with the Metropolitan Public Health Department and obtain its advance written approval."

34. Hotels and similar facilities, including the Resort, were also subject to the requirements of Section 10 of Order 12:

> Hotels, short term rental properties, commercial lodges, and dormitories remain open for lodging guests or residents, and may operate meeting, conference, banquet, or ball rooms, subject to the conditions set out in Section 7 in this Order. These facilities may provide food and beverage pick-up and room-service, and restaurants located therein may operate at up to the number of customers that may be seated in compliance with CDC guidance on social distancing, not to exceed 125 customers per floor, and subject to the conditions set out in Section 4, paragraph 1 in this Order.

35. Section 14 of Order 12 provided that "[v]iolations of this Order shall be subject to civil and criminal penalties."

36. Despite these circumstances and the restrictions that had been imposed by the MPHD, Gaylord Opryland continued to represent to Avantax, through early 2021, that it believed

it would be able to host the Annual Conference safely, legally, as scheduled, and at the size contemplated in the Agreement. Avantax representatives visited the hotel in February 2021 to discuss the plans and details pertaining to the Annual Conference.

37. During that visit, Gaylord Opryland 's representatives expressed, for the first time, concerns about whether the Annual Conference could go forward as planned, given the restrictions put in place by the Metro Nashville Government. Under the mandates in place at that time, a gathering of the size and type contemplated by the Agreement would have been illegal. However, Gaylord Opryland representatives nevertheless continued to express optimism that the event would be able to move forward, as planned.

38. Following the trip to Nashville, the Parties continued to plan for the Event to go forward in June 2021, but also began discussing alternative plans should the applicable restrictions remain in place. The Parties discussed proposals from Gaylord Opryland that included both a smaller event in 2021 and other events at later dates.

39. On March 10, 2021, the MPHD sent the aforementioned MPHD Letter to Gaylord Opryland and other "Hospitality Industry Partners," detailing its expectations regarding the restrictions pertaining to gatherings that would remain in place in Nashville through July 1, 2021. That letter, authored by Dr. Wright, indicated that restrictions on gatherings that were set forth in its various Orders, including Order 12, were expected to remain in place in Davidson County through July 1, 2021. The MPHD Letter further stated that "celebratory functions" similar to wedding receptions—the type of event contemplated in the Agreement—were deemed to be "very high risk," and would be capped at 300 attendees. The next category of gatherings, those deemed to be merely "high" risk, would be capped at 750 attendees.

40. On March 15, 2021, as part of a discussion regarding the possibility of a smaller event in 2021, a Gaylord Opryland Senior Sales Executives sent Avantax a copy of the MPHD Letter. Gaylord Opryland provided this letter as confirmation that a smaller event would be feasible under the restrictions expected to be in place in June 2021. This letter also confirmed that it would be illegal and impossible for the Parties to move forward with a 1,200-person event of type contemplated by the Agreement in June 2021.

41. Avantax ultimately determined that a smaller event in June 2021 was not feasible and informed Gaylord Opryland of that fact. The smaller event that Gaylord Opryland proposed was also not what the Parties had contemplated and agreed to when they entered into the Agreement. Although the Parties attempted to pick a later date, those efforts were unsuccessful due to Gaylord Opryland's limited availability into the foreseeable future, apparently due to the numerous other events it had already rescheduled during the Pandemic.

42. On March 23, 2021, based upon the MPHD Letter, which it had received on March 15, 2021 and which made clear that the Annual Conference could not go forward as planned, Avantax sent Gaylord Opryland written notice that it was invoking the Force Majeure provision in the Agreement (the "Termination Letter"). The Termination Letter informed Gaylord Opryland that based upon the MPHD letter, it was apparent that Gaylord Opryland would not be able to host an event that would allow for a minimum of 1,200 attendees in June 2021 of the type and nature contemplated by the Agreement. Avantax noted that given the expected restrictions, holding such an event in Nashville as of that date would be "illegal" and "impossible," as defined under the Agreement. Avantax also explained that it would be impossible to plan and make arrangements for such an event absent significant lead time and preparation. The invocation of the Force Majeure provision by Avantax operated as a termination of the Agreement.

43. At the time it sent the Termination Letter, Avantax had no choice but to make alternative plans at a different location, where Avantax could reasonably anticipate being able to move forward with its annual conference. Such alternative arrangements had to be made sufficiently in advance of the dates on which the annual conference was scheduled to occur to ensure availability of facilities and adequate time for travel arrangements. After sending the Termination Letter, Avantax promptly arranged to host the Annual Conference in Texas, in a venue where restrictions prohibiting such an event were not in place.

44. On March 24, one day after Avantax sent the Termination Letter, Dr. Wright signed Order 13 addressing the "Phase Three Reopening" ("Order 13"). Order 13 relaxed some of the restrictions contained in the most recent amended version of Order 12, and slightly increased the permitted number of customers in areas in which food and alcohol were served to 175 persons per floor, up from 125 persons per floor. The other restrictions relevant to this case remained in place, indefinitely.

45. After Avantax sent the Termination Letter, and after Order 13 was released, Gaylord Opryland representatives again confirmed to Avantax that they also expected Nashville's gatherings restrictions to remain in place through the end of June 2021. In the course of discussions relating to a potential smaller event at the Resort, a Gaylord Opryland sales executive volunteered in an email that, as of April 5, 2021, Gaylord Opryland had "heard that we should have something in writing this week that all limitations will be going away by June 30th and we can push for exceptions for earlier June groups." The already-cancelled Annual Conference was previously scheduled to begin nearly two weeks before the then-anticipated June 30 expiration date for the restrictions, and Gaylord Opryland did not and could not guarantee, even at that time, that that an "exception" for a 1,200 person event earlier in June 2021 would be approved.

46. Upon receiving the Termination Letter, Gaylord Opryland did not dispute Avantax's invocation of the Force Majeure clause. Indeed, for a period of months, Gaylord Opryland did not send any written response specifically addressing Avantax's written notice that it was invoking the Force Majeure provision, or the substantive issues addressed therein. Despite its prior termination of the Agreement, Avantax continued to try in good faith to work out arrangements for a future event with Gaylord Opryland. For nearly a month, the Parties continued to engage in discussions regarding alternative events in 2022, 2023, and even 2024.

47. On April 20, 2021, having still not provided any substantive response to Avantax's March 23, 2021 written notice, Gaylord Opryland sent Avantax an invoice for $1,326,206.00 pursuant to the Cancellation Clause in the Agreement, along with wiring instructions. The invoice provided for a due date of May 20, 2021. The invoice made no reference to Avantax's March 23 letter, nor did it dispute Avantax's invocation of the Force Majeure clause.

48. On April 27, 2021, over a month after Avantax's letter and three weeks after Gaylord Opryland again confirmed that it still expected Nashville's gatherings restrictions to remain in place through the end of June 2021, the MPHD unexpectedly announced that all pandemic-related gatherings restrictions would be lifted as of May 14, 2021. A Gaylord Opryland Senior Sales Executive forwarded an internal Gaylord communication detailing the changes to Avantax on April 28, 2021, a week after Gaylord Opryland sent its invoice, as part of an invitation for renewed discussions pertaining to possible future events.

49. As of the date of this filing, Avantax believes that Gaylord Opryland continues to contend it is owed $1,326,206.00 pursuant to the Cancellation Clause in the Agreement, notwithstanding the circumstances that led to Avantax's termination of the Agreement and its entirely proper invocation of the Force Majeure provision.

## DEFENSES TO BREACH OF CONTRACT CLAIM

### I. FORCE MAJEURE

50. The COVID-19 Pandemic was a circumstance beyond the reasonable control of either Avantax or Gaylord Opryland, and was the type of event contemplated in the Force Majeure provision in the Agreement, which applied to "acts of God, war, acts of domestic terrorism, strikes or similar circumstances [that] make it illegal or impossible to provide or use the Hotel facilities."

51. Neither Avantax nor Gaylord Opryland could have reasonably anticipated or controlled the Pandemic.

52. In other pending litigation involving similar issues and a similar force majeure provision, Gaylord Opryland has acknowledged that a global pandemic is the type of act of God that qualifies as a force majeure event. *See Lampo Group v. Marriott Hotel Services, Inc.*, 2021 WL 3490063, at *8 (Aug. 9, 2021 M.D. Tenn.).

53. The MPHD Orders relating to the Pandemic, including but not limited to the Seventh Amended and Restated Order 12 from the Interim Chief Medical Director addressing the Phase Three Reopening, made it illegal and impossible for Gaylord Opryland to host an event of the nature and size contemplated in the Agreement, so long as those restrictions were in place.

54. The Orders of the MPHD relating to the Pandemic, and the restrictions imposed therein, were also circumstances beyond the reasonable control of either Avantax or Gaylord Opryland, and were a qualifying "circumstance" under the Force Majeure provision in the Agreement, which made it "illegal or impossible to provide or use the Hotel facilities." Neither Avantax nor Gaylord Opryland could have reasonably anticipated or controlled the Orders of the MPHD relating to the Pandemic.

55. The Agreement required that Gaylord Opryland provide access to event space for 1,200 attendees in a single room, as well as other event spaces capable of simultaneously hosting the same number of attendees in multiple rooms capable of holding as many as 300 attendees. The Agreement also expressly provided that Gaylord Opryland was to provide "a minimum of 83,287 gross square feet of [the] Ryman Exhibit Hall" in connection with the Annual Conference. In addition, the Agreement expressly contemplated the availability of alcohol at the events and "receptions" provided for in the Agreement. Under the restrictions imposed by the MPHD, it would have been illegal and impossible for Opryland to "provide" and for Avantax to "use" the referenced facilities, particularly while engaging in the types of social interactions and activities that were contemplated under the Agreement.

56. The Agreement also required Gaylord Opryland to provide access to other spaces and amenities including, but not limited to, full bar service, full access to restaurants, access to the fitness center, and access to other attractions in and around the Resort and the City of Nashville. Access to such spaces and amenities was not available, as contemplated in the Agreement, during the relevant period.

57. Under the restrictions in place, even if Gaylord Opryland were permitted through an exemption to host an event for 1,200 attendees, as required by the Agreement, it would have been illegal and impossible to put as many as 300 attendees—let alone 1,200—in a single room, or even on a single floor, as provided under the Agreement.

58. Notwithstanding the ongoing restrictions, prior to late February 2021, Gaylord Opryland assured Avantax it believed it would be able to host the Annual Conference, as provided in the Agreement.

59. However, in late February and into early March 2021, Gaylord Opryland began to express concerns, for the first time, that the Annual Conference, as planned, might not be possible. In the weeks leading up to Avantax's decision to terminate the Agreement, representatives of Gaylord Opryland confirmed that it was also their understanding that under the MPHD restrictions in place, it would have been illegal and impossible for Gaylord Opryland to host the Annual Conference as contemplated under the Agreement, but expressed hope that they might be able to get an "exception" from the MPHD.

60. During the same period, Gaylord Opryland representatives began submitting ideas and proposals to Avantax for smaller events that would be permissible under the MPHD restrictions. Gaylord Opryland continued to provide information on such proposals even after Avantax sent its Termination Letter.

61. Prior to being forwarded the MPHD Letter by Gaylord Opryland, Avantax was not aware that the MPHD had provided information addressing the anticipated duration of the referenced COVID-19 restrictions. In particular, Avantax was not aware, prior to receiving the MPHD Letter, that the MPHD expected that the restrictions would remain in place through the planned dates of the Annual Conference.

62. The MPHD Letter made clear that any event at the Gaylord Opryland during the referenced period were to be capped at 300 attendees or, at most, 750 attendees.

63. Within 10 days of receiving the MPHD letter, which informed Avantax, for the first time, that the restrictions were expected to remain in place through July 1, 2021, Avantax sent its Termination Letter, invoking the Force Majeure provision and terminating the Agreement.

64. As of the date of the Termination Letter, and based upon the March 10, 2021 letter from the Nashville Metro Public Health Department, it was the understanding of both Avantax and

Gaylord Opryland that the restrictions pertaining to gatherings, including those reflected in Order 12, were expected to remain in place in Nashville through July 1, 2021, which was after the scheduled dates for the Annual Conference.

65. The COVID-19 Pandemic and the attendant restrictions on business operations were a *force majeure* "circumstance" that, independently and in combination, authorized termination of the Agreement.

66. Contrary to the position taken by Gaylord Opryland, the Agreement did not permit Avantax to "wait and see" whether the restrictions imposed by the MPHD might be lifted. In addition to the fact that it was impossible for either Party to know as of the date of the Termination Letter when such restrictions might be lifted, the Agreement required Avantax to provide notice of its intent to terminate under the Force Majeure provision "within ten (10) days after learning" of the qualifying "circumstances."

67. The first time that Avantax learned of "circumstances" that warranted invocation of the Force Majeure provision was when it learned for the first time, through Gaylord Opryland's forwarding of the MPHD Letter, of reliable information from the MPHD indicating that the restrictions imposed were expected to remain in place through the dates of the Annual Conference.

68. Under these circumstances, Avantax properly invoked the Force Majeure provision in terminating the Agreement and in cancelling the Annual Conference. Therefore, Gaylord Opryland is not entitled to be paid any cancellation fees or other costs and is not entitled to any amount of liquidated damages.

## II. FRUSTRATION OF PURPOSE

69. At the time Avantax sent the Termination Letter, the ongoing ramifications of the COVID-19 Pandemic, including without limitation, restrictions on large gatherings, made the performance of the Agreement according to its plain terms both illegal and impossible, because Gaylord Opryland could not provide, and Avantax could not use, the Resort's facilities as specified in the Agreement. Moreover, given the information available at the time, Gaylord Opryland did not have the ability to provide any assurance that such restrictions would be lifted prior to the dates of the planned event.

70. The COVID-19 Pandemic and specifically, the spread of the virus and associated risk to the health, safety, and welfare of both the Resort's employees and guests, including Avantax, created dangerous and unsafe conditions in and around large hospitality-focused facilities, including the Resort.

71. Given the size of the Resort, there can be no question that the COVID-19 virus – which can spread through aerosolized airborne particles – was physically present on the premises of the Resort and the Gaylord Opryland was no longer reasonably safe for the intended use. Indeed, the essential function of Avantax's Annual Conference was to bring together over 1,000 of Avantax's financial professionals and employees for meetings, gatherings, receptions, meals, and other activities.

72. Without limitation, the COVID-19 Pandemic, including restrictions imposed on large gatherings, made it impossible for Gaylord Opryland to ensure or provide assurance to Avantax, as of the date of the Termination Letter, that it would be able to safely or legally:

(a) provide access to event space for 1,200 attendees in a single room, as well as other event spaces capable of simultaneously hosting the same number of attendees in multiple rooms capable of holding as many as 300 attendees;

(b) provide "a minimum of 83,287 gross square feet of [the] Ryman Exhibit Hall" in connection with the [Annual Conference];" or

(c) provide access to other spaces and amenities that were required under the Agreement including, but not limited to, full bar service, full access to restaurants in the Resort, access to the fitness center in the Resort, and access to other attractions in and around the Resort and the City of Nashville.

73. Gaylord Opryland acknowledged its inability to assure Avantax that it would be able to provide access to the referenced facilities and amenities directly and indirectly prior to Avantax's sending of the Termination Letter.

74. During that period, Gaylord Opryland attempted to persuade Avantax to schedule a smaller event that would have been permissible under the restrictions in place at the time, in lieu of the Annual Conference. The proposed smaller event would have been materially different than the Event contemplated by the Agreement and, ultimately, was not feasible for Avantax.

75. The doctrine of frustration of purpose under Tennessee law applies in cases of extreme hardship, so that businesses and their representatives, who must make their arrangements in advance, can rely with certainty on their contracts.

76. The risks associated with the COVID-19 Pandemic, as well as the related restrictions the MPHD imposed, were not reasonably foreseeable to either Avantax or Gaylord Opryland at the time they entered into the Agreement. Neither Party agreed to assume the risks

associated with the COVID-19 Pandemic or the restrictions imposed by the MPHD relating to the Pandemic, relevant to the performance of the Agreement.

77. Gatherings of the nature and size of the Annual Conference take months and significant resources to plan, and the attendees coming from across the country had to have time to make travel arrangements.

78. The COVID-19 Pandemic and the restrictions imposed on large gatherings caused extreme hardship to the Parties, such that Avantax could not rely with any degree of certainty on Gaylord Opryland to be able to safely or legally "provide" safe access to the facilities, and could not reasonably anticipate being able to safely or legally "use" such facilities, in the manner contemplated in the Agreement, even if access to such facilities were provided. As such, Avantax could not reasonably plan on moving forward with the Annual Conference, and could not reasonably be expected to spend hundreds of thousands of dollars making arrangements for it.

79. Even if performance of the Agreement by both Parties remained technically "possible," the value of the performance of the Agreement to Avantax was totally or nearly destroyed by the COVID-19 Pandemic in combination with the related restrictions on large gatherings, such that those circumstances caused an actual failure of consideration.

80. Under these circumstances, Avantax's termination of the Agreement and cancellation of the Annual Conference was proper under the frustration of purpose doctrine.

**<u>FIRST CAUSE OF ACTION:</u>**
**Declaratory Judgment**

81. Plaintiff restates and adopts by reference the allegations of the above paragraphs as though fully set out herein.

82. An actual controversy has arisen between Avantax and Gaylord Opryland with respect to the Agreement. Gaylord Opryland claims that it is entitled, under the Agreement, to

payment of cancellation fees in the form of liquidated damages, in the amount of $1,326,206. Avantax denies that Gaylord Opryland is entitled, under the Agreement, to cancellation charges or fees, or liquidated damages, for the reasons identified above. Thus, there is a *bona fide* dispute between the Parties as to their rights and obligations under the Agreement.

83. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Avantax respectfully turns to this Court for guidance and requests this Court declare the rights and obligations of the Parties under the Agreement with respect to the matters in dispute. Such a resolution is also expressly permitted by Tennessee Code Annotated section 29-14-103, which provides that "[a]ny person interested under a . . . written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, [or] contract . . . may have determined any question of construction or validity arising under the instrument, statute, ordinance, [or] contract, . . . and obtain a declaration of rights, status or other legal relations thereunder." Tenn. Code Ann. § 29-14-103.

84. Specifically, Avantax respectfully requests a declaratory judgment from this Court that:

(a) Avantax properly invoked the Force Majeure provision in the Agreement, because the COVID-19 Pandemic and the restrictions imposed by the MPHD relating to the Pandemic were qualifying "circumstances" that made it illegal or impossible for Gaylord Opryland to provide and for Avantax to use the facilities in the manner provided for in the Agreement;

(b) The frustration of purpose doctrine applies such that Avantax's performance under the Agreement was excused and its termination of the Agreement was proper, based upon the extreme hardship to the Parties caused by the Pandemic and the

restrictions imposed by the MPHD relating to the Pandemic, which were not foreseeable or controllable by either Party; and

(c) Under the Force Majeure provision in the Agreement and under the frustration of purpose doctrine, Avantax does not owe (and Gaylord Opryland is not entitled to) any cancellation fees, penalties, and/or liquidated damages relating to the Agreement or its termination.

85. Avantax further requests that this Court enter an Order awarding fees, expenses, and costs arising from this lawsuit to Avantax, pursuant to the "Litigation Expenses" provision in the Agreement.

**WHEREFORE**, premises considered, Plaintiff prays this Court grant the following relief:

(i) Enter a declaratory judgment that Avantax properly invoked the Force Majeure provision in the Agreement;

(ii) Declare that the frustration of purpose doctrine applies such that Avantax's performance under the Agreement was excused and its termination of the Agreement was proper;

(iii) Declare that Avantax does not owe, and Gaylord Opryland is not entitled to, any cancellation fees, penalties, and/or liquidated damages relating to the Agreement its termination under the Force Majeure provision and the doctrine of frustration of purpose;

(iv) Award fees, expenses, and costs arising from this lawsuit to Avantax, pursuant to the Litigation Expenses provision in the Agreement;

(v) Empanel a jury of twelve (12) to hear this cause; and

(v) Grant Avantax such other relief as the Court deems just and proper.

Dated: December 21, 2021

Respectfully Submitted,

**NEAL & HARWELL, PLC**

*/s/ J. Isaac Sanders*
J. Isaac Sanders (BPR # 29372)
Jeffrey A. Zager (BPR # 32451)
William J. Harbison II (BPR # 33330)
1201 Demonbreun Street, Suite 1000
Nashville, TN 37213
(615) 244-1713
isanders@nealharwell.com
jzager@nealharwell.com
jharbison@nealharwell.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2021 a true and exact copy of the foregoing has been served via US Mail:

John C. Josefsberg
Steven M. Rudner, Esq.
Rudner Law Offices
12740 Hillcrest Road, Suite 240
Dallas, Texas 75230

Stephen J. Zralek
Spencer Fane Bone McAllester
511 Union Street, Suite 1000
Nashville, TN 37219

*/s/ J. Isaac Sanders*