IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| AVANTAX WEALTH MANAGEMENT, INC. f/k/a H.D. VEST, INC., | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | |
| v. | ) ) | Case No. 3:21-cv-00810 |
| | ) | JUDGE CAMPBELL |
| MARRIOTT HOTEL SERVICES, INC. a Delaware Corporation, as manager of GAYLORD RESORT & CONVENTION CENTER, | ) ) ) ) ) | MAGISTRATE JUDGE HOLMES |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM

This case arises out of contract dispute between Avantax Wealth Management, Inc. ("Avantax") and Marriott Hotel Services, Inc. ("Marriott" or "the Hotel"), manager of Gaylord Opryland Resort & Convention Center in Nashville, Tennessee. In March 2019, Marriott entered into a contract with H.D. Vest, a corporate predecessor to Avantax, pursuant to which H.D. Vest was to hold an event at the Hotel, from June 18-24, 2021.[1] On March 25, 2021, Avantax terminated the contract, citing ongoing government restrictions related to the COVID-19 pandemic. Avantax claims its performance under the contract is excused under the contract's force majeure clause. Marriott disagreed and sent Avantax an invoice for $1,326,206.00 in liquidated damages.

Avantax filed this lawsuit seeking declaratory judgment that it properly invoked the force majeure provision of the contract and that its performance was, therefore, excused. (Complaint,

---

[1] The Contract was entered into by Avantax's corporate predecessor, H.D. Vest, Inc. That entity was purchased by Blucora, Inc., and through a merger became Avantax. (*See* Doc. Nos. 78-15, 78-16 (SEC Form 8K)). For ease of reference, the Court refers to the contracting party as Avantax.

Doc. No. 1 (October 22, 2021); Amended Complaint, Doc. No. 11 (Dec. 21, 2021)). Marriott filed a counterclaim for breach of contract seeking liquidated damages in the amount of $1,326,206.00, or, in the alternative, lost profits.

Now before the Court are the parties' cross motions for summary judgment (Doc. Nos. 53, 56), which are fully briefed. (Doc. Nos. 54, 57, 73, 78, 80). The parties filed and responded to statements of material undisputed fact. (Doc. Nos. 55, 58, 74, 79, 83). Avantax filed objections to the testimony of Michael McDonnell, which was submitted as an exhibit in support of Marriott's Motion for Summary Judgment. (Doc. Nos. 76, 77). Marriott filed a response to the objections. (Doc. No. 81).

Also before the Court is Avantax's motion for sanctions concerning Marriott's alleged spoliation of electronic evidence. (Doc. No. 48). As a remedy for the alleged spoliation, Avantax requests the Court impose negative inferences as to all disputed factual matters, or, in the alternative, impose evidentiary sanctions against Marriott. (*Id*.). Avantax also requests the Court award attorneys' fees and costs associated with the filing of the motion for sanctions and a previous motion to compel discovery. (*Id*.).

For the reasons stated herein, Avantax's Motion for Summary Judgment (Doc. No. 53) will be **GRANTED**; and Marriott's Motion for Summary Judgment (Doc. No. 56) will be **DENIED**.

The Court reaches this decision based on consideration of the facts presented by the parties under the standard of review for motions for summary judgment, and not due to the imposition of negative inferences as a sanction for spoliation. This is not to say that the Court finds there was or was not sanctionable conduct on the part of Marriott – only that a negative inference was not necessary for the disposition of the motions for summary. In light of the disposition of the motions

for summary judgment, as discussed further below, the Motion for Sanctions will be **GRANTED** in part, **DENIED** in part.

# I.  BACKGROUND[2]

## A.  The Agreement

On March 31, 2019, the parties entered into an agreement (the "Agreement") pursuant to which Avantax would hold the "HD Vest Connect Conference" (the "event") at the Hotel from June 18-24, 2021. (*See* Doc. No. 11-1 at 1). Pursuant to the terms of the Agreement, the Hotel reserved a block of rooms for the group. (*Id*. at 1). The block consisted of a total of 3699 room

---

[2]  The Court has made its best effort to base the background on the parties' statements of undisputed material fact and the responses thereto. (*See* Doc. Nos. 55, 58, 74, 79, 83). This effort, however, was stymied by the lengthy recitation of facts (over 277), some of which are not material to the dispute, and many of which failed to comply with Local Rule 56.01(c) by including multiple facts in the same paragraph.

Marriott compounded these difficulties by responding to Avantax's Statement of Undisputed Material Facts by quibbling over word choices, particularly in response to statements concerning the terms of the Agreement. (*See* Doc. No. 74 at ¶¶ 3-10; 14-15, 17-18, 20-21, 25). For example, in response to Avantax's statement that "[t]he food and beverage minimum was, per the Agreement, the other 'major component,'" Marriot responded that the Agreement referred only to the food and beverage minimum as a "major component," not the "other major component." (*Id*. at ¶ 8). In another example, Marriot disputes a statement of fact based on Avantax's reference to menus with options for "every meal, hors d'oeuvres, and alcohol," and unhelpfully clarifies that the menu provides "pricing for breakfast, lunch, dinner, hors d'oeuvres, and alcohol." (*Id*. ¶ 20). Marriott responded in similar fashion to Paragraphs 85 (disputing the use of the word "normally"), 86 (distinguishing between "working on the event" and "planning for the event"), 101 (distinguishing between "rely upon [] information," "use the information," and "read and consider the information"), 108 (disputing the use of "cancellation penalties" instead of "cancellation fees"). The Court takes a dim view of such gratuitous exactitude which is not helpful to the Court's resolution of the issues and has not been considered.

Nor has the Court considered Marriott's response to Paragraph 107, which is over two pages long, contains extensive legal argument and multiple case citations, none of which is appropriate in a response to a statement of fact. The Court will note that Marriott is not alone in this regard. Avantax has also incorporated legal argument into its responses to the statements of fact, which has likewise been disregarded. (*See* Doc. No. 79 at ¶ 15).

nights at rates ranging from $149.00 to $244.00. (*Id*. at 1-2). Avantax is required to pay a minimum of 80% of the room night commitment, plus resort fees and applicable taxes.[3] (*Id*. at 11).

The Agreement provided for event space, specifically, that the Hotel had "reserved space for your meeting and social functions based on [the Hotel's] understanding of your needs at this time, as set forth in the attached Program Schedule[.]" (Doc. No. 11-1 at 7). The Program Schedule listed time/date blocks, the function type, designated function space, set up style, and expected attendance. (*Id*. at 7-10). For each day of the conference, the Program Schedule designated a large space for 1,200 attendees for "general session," three rooms for "breakout" for 300 attendees, and seven rooms for "breakout" for 100 attendees. (*Id*.). The Program Schedule also showed a "Welcome Reception" for 1,200 attendees on Monday, June 21, 2019. (*Id*. at 8).

Although the Program Schedule designated specific function space, "[s]pecific meeting rooms cannot be guaranteed and are subject to change." (*Id*.). In addition, "[The Hotel] reserve[d] the right to adjust the assignment of the Group's meeting and function space to a size appropriate for the number of expected attendees at each function." (*Id*.).

The Agreement specifically provided that "the food and beverage functions listed on the schedule of events are a major component of the Agreement." Accordingly, Avantax was required to spend a minimum of $575,000 for food and beverage service, plus applicable taxes and service charge (the "Food and Beverage Guarantee"). (*Id*. at 10).

Under the cancellation policy in the Agreement, if Avantax cancelled the Agreement "for reasons other than those specified in this Agreement," it agreed to pay liquidated damages to the

---

[3]     Avantax calculates the room minimum, with tax, as $782,230. (*See* Doc. No. 74, ¶ 7). Marriott disputes this amount, and provides daily room rates that, by the Court's calculation amount to approximately $778,000. (*Id*.).

4

Hotel based on a specified percentage of the Food and Beverage Guarantee and the total room revenue, depending on the date of cancellation. (*Id*. at 13). For cancellations within 180 days of the event, liquidated damages are 100% of the total room revenue, plus 75% of the Food and Beverage Guarantee. (*Id*.). This "cancellation charge" is due within 30 days of the cancellation and accrues interest at the rate of 1.5 percent per month. (*Id*. at 14).

The Agreement provided that it "is subject to all applicable federal, state, and local laws, including health and safety codes, alcoholic beverage control laws, disability laws, federal anti-terrorism laws and regulations, and the like," and that the parties "agree to cooperate with each other to ensure compliance with such laws." (*Id*. at 15).

Performance under the agreement is excused under the force majeure provision as follows:

> Either party may be excused from performance without liability if circumstances beyond its reasonable control, such as acts of God, war, acts of domestic terrorism, strikes, or similar circumstances, make it illegal or impossible to provide or use the Hotel facilities. The ability to terminate pursuant to this clause is conditioned upon delivery of written notice to the other party setting forth the basis for such termination within ten (10) days after learning of such basis.

(*Id*. at 14).

## B. The COVID-19 Pandemic

Almost one year after the parties entered into the Agreement, the Metropolitan Board of Health of Nashville and Davidson County (the "BOH") declared a public health emergency concerning the spread of the Coronavirus Disease 2019 ("COVID-19"), and directed the Chief Medical Director to institute measures "to maintain and protect the public health…"[4] The

---

[4] Metropolitan Board of Health of Nashville and Davidson County Declaration of Public Health Emergency, March 15, 2020 (filed at Doc. No. 53-9).

Declaration of Emergency, which was originally set to expire in April 2020, was extended several times.[5] On March 11, 2021, the BOH voted to extend the Declaration of Emergency through June 30, 2021.[6] Beginning in March 2020, the Metropolitan Public Health Department ("MPHD") issued a series of orders (the "Public Health Orders") suspending and/or limiting capacities in bars, restaurants, and other facilities, and restricted various types of gatherings.[7]

In February 2021, Avantax visited the Hotel to discuss the details of the event. During this planning visit, the Hotel told Avantax that "because [it] was working closely with MPHD, it had reason to believe that the gathering restrictions would be lifted before the event dates." (*See* Am. Answer, Doc. No. 37 at ¶ 37). However, the Hotel admitted that "if the restrictions remained unchanged over the event dates, the event could not go forward as contracted." (*Id.*). Instead, the events would have to be "split into multiple areas …" and capped at 500 people per room; for "events with food and alcohol, Avantax would have to split up into as many as 7 or 8 different rooms." (Herrington Dep., Doc. No. 53-3 at 86-87, 89-90, 91-92; Williams Dep., Doc. No. 53-4 at 147-48; Resp. to Avantax SUMF, Doc. No. 74 at ¶ 75).

In March 2021, the parties began discussing the possibility of a smaller event capped at 500 attendees. (Doc. No. 53-22; Marriott SUMF, Doc. No. 79 at ¶ 73). Under the capacity restrictions at the time, even a 500-person event would have required splitting some functions into

---

[5]     Extension of Metropolitan Board of Health of Nashville and Davidson County Declaration of Public Health Emergency, April 8, 2021 (filed at Doc. No. 53-10).

[6]     *Id*.

[7]     *See e.g.*, Seventh Amended and Restated Order 12 from the Interim Chief Medical Director – Phase Three Reopening, Metro Public Health Department of Nashville and Davidson County, Feb. 27, 2021 (Doc. No. 53-11); Order 13 from the Interim Chief Medical Director – Phase Three Reopening, Metro Public Health Department of Nashville and Davidson County, March 24, 2021 (Doc. No. 53-12).

multiple rooms. (*See* Resp. to Avantax SUMF, Doc. No. 74 at ¶ 89). When Avantax made the proposal, Marriott agreed to move forward with drafting an addendum that would have provided for lower attendance, revised facilities, and a lower food and beverage minimum. (Marriott SUMF, Doc. No. 79 at ¶ 73). An addendum was drafted, but never finalized or signed. (Harness Dep., Doc. No. 53-6 at 281-285).

On March 15, 2021, the same day the Hotel sent Avantax a revised addendum, it forwarded a letter from MPHD to "Hospitality Industry Partner[s]." The letter, which was dated March 10, 2021 (the "March 10 Letter"), states:

> Dear Valued Hospitality Partner,
>
> I want to provide you with an update on our reopening plans and guidance for the second half of 2021.
>
> …
>
> [B]ased on [the vaccination] trend, we can forecast with reasonable confidence that we will reach 40 percent vaccination by July 1. If we continue to see strong demand for the vaccine and a steady or increased supply from the federal government, we could reach that mark sooner.
>
> Increasing vaccination coverage will allow for larger events as outlined below, in an example of our expectation when coverage reaches about 40 percent. There will be assessment at other levels of vaccine coverage and there may be changes at different points along the way.
>
> Note these vaccination coverage numbers are triggers for evaluation of the medical situation as it exists in Davidson County at the time they are reached. These are not automatic thresholds for increases in capacities and attendance, but guideposts for medical and epidemiological assessment of the situation on the ground.
>
> For example: **Gathering restrictions at 40% vaccination (estimated by July 1)**

| | |
|---|---|
| • Very Low Risk – Cap of 5,000 attendees<br>• Low Risk – Cap of 1,250 attendees | • High Risk – Cap of 750 attendees<br>• Very High Risk – Cap of 300 attendees |

7

…

At higher vaccination levels, and with a continued diminution of the virus in our community, these attendance numbers will grow further. As noted, there may be interim step increases at levels other than 40 percent of vaccination coverage, and the increases will apply broadly.

This letter is designed to help your business plan events months from now by providing assurance capacity restrictions will fade as increased vaccinations protect us from the virus. If conditions worsen as a result of a new variant, vaccination percentages may not necessarily correspond to loosening restrictions.

Thank you for your continued emphasis on keeping your clients safe.

Respectfully,

Gill C. Wright III, MD, FAAFP, MMM
Chief Interim Medical Director of Health

(March 10, 2021 Letter from MPHD, Doc. No. 53-17 at PageID# 1059).

This was the first long-term plan document the Hotel had received from MPHD.[8]  It forwarded the information from MPHD to clients, including Avantax, with the expectation that they would use the information for planning purposes. (Adams Dep., Doc. No. 53-19 at 75, 78).

## C.  Cancellation

Ten days after the Hotel forwarded the March 10 Letter, Avantax notified the Hotel that it was terminating the Agreement based on the force majeure provision. (Letter from Avantax to Marriott dated March 25, 2021, Doc. No. 53-23).  As grounds for the termination, the letter stated:

The letter sent to you by the Metro Public Health Department of Nashville/Davidson County dated March 10, 2021 that is attached hereto as **Exhibit A** and was received by Avantax on March 15, 2021 ("the Davidson

---

[8]     Michael O'Connor, Director of Event Management at Gaylord Opryland Resort and Convention Center and the Hotel's primary contact with MPHD, said the March 10 Letter was the first "long-term plan document from the health department setting out projections" he had seen. (O'Connor Dep., Doc. No. 53-13 at 114-15). John Adams, the General Manager of Gaylord Opryland Resort and Convention Center, testified that the March 10 Letter was "the only plan [he] ever remember[ed] receiving or ever got." (Adams Dep., Doc. No. 53-19 at 75, 78).

8

County Restriction Letter") indicates that through July 1, 2021 very high risk gatherings (which includes celebratory functions such as the event contemplated by Avantax in the Agreement) will be limited to a cap of 300 people. As such, due to the fact that this is Avantax's annual national conference where there will be celebratory events (similar to a wedding reception-type event where alcohol will be served and friends will be reunited and gather closely together), you will NOT be able to honor the terms of the Agreement and hold an event that will allow for a minimum of 1,200 attendees in June 2021, which is the minimum number of expected attendees as shown on pages 7 and 8 of the Agreement.

…

COVID-19 is a global pandemic that is an act of God (or other similar occurrence) that has resulted in county restrictions limiting event size. The Davidson County Restriction Letter indicates that the county restrictions are estimated to remain in place through July 1, 2021; therefore, as of this date Avantax is on notice from Davidson County that the Event will be "illegal" and "impossible" if it is held with 1,200 attendees, and the Force Majeure provision of the Agreement has now been triggered. As you are aware, an event this size requires significant planning and travel (which requires advance time and reservations); therefore, now that Avantax is on notice that these restrictions are in place and are expected to be in place through July 1, 2021, it is impossible to plan for and hold an Event of this size. It will also be illegal for such an event to be held pursuant to the Davidson County Restriction Letter. Thus, the Force Majeure provision has been triggered and allows for termination of the Agreement with no further Avantax liability.

This notice is being provided to you within ten (10) days of the date you provided Avantax with the Davidson County Restriction Letter (which was provided to Avantax on March 15, 2021). Because this Agreement is being terminated due to a Force Majeure event, Avantax will not pay any cancellation fees or liquidated damages as contemplated in the Agreement.

(*Id*.).

Shortly after learning of Avantax's cancellation, the Hotel responded to a request for "a few examples of meetings cancelling because of the food and beverage limitations or other reasons due to MPHD parameters" to be used in a presentation to MPHD. (Doc. No. 53-24 at PageID#1114-15). In response, the Hotel compiled a list of what it characterized as "groups that

9

have cancelled or will cancel if the guidelines specifically related to the Catering restrictions do not change." (*Id*.). Avantax was at the top of the list. (*Id*.). The Avantax event was described as having 1500+ attendees. (*Id*.). The Hotel wrote:

> [Avantax] [o]fficially cancelled this week – They hung in there until the last update from the city but it wasn't enough to move forward due to F&B restrictions. Group's receptions and parties are a big part of their event – Need 1500pp with alcohol – will not split up groups into different rooms – current restrictions are 125pp. Tried to pare down the meeting to 500 to make it work but still major restriction and could not get there to make the ROI work.

(*Id*.).

## D.    Post Cancellation Events

Following the notice of termination, representatives of the parties continued to discuss possible ways to resolve their dispute, for example by Avantax rebooking for a later date. (*See* Doc. No. 75-1). They were unable to find a workable date. (*Id*.).

On April 20, 2021, the Hotel sent Avantax a "cancellation invoice" for liquidated damages in the amount of $1,326,206.00. (Doc. No. 53-25 at PageID# 1119-21). The invoice states that this amount was calculated based on 100 percent of the room charges (3,619 room nights at $244 per night, 80 room nights at $149.00 per night) and 75% of the $575,000 food and beverage minimum. (*Id*.).

On April 27, 2021, approximately one month after Avantax cancelled and one week after the Hotel sent the cancellation invoice, the City of Nashville announced that "all pandemic restrictions and capacity limits will be dropped" effective May 14, 2021. (Marriott SUMF, Doc. No. 79 at ¶ 95). Avantax held its national conference on the dates originally scheduled with the Hotel at the Omni Hotel in Dallas, Texas. (*Id*. at ¶ 98). Approximately 1,000 people attended. (*Id*.).

10

Avantax refused to pay the invoice and denies that any such amounts are owed. This lawsuit followed. Avantax initiated the suit, seeking declaratory judgment that it does not owe the Hotel any cancellation fees and/or liquidated damages relating to termination of the Agreement. (Doc. No. 11). The Hotel filed a counterclaim for breach of contract seeking liquidated damages in the amount of $1,326,206.00 or lost profits. (Doc. No. 12). Both parties seek an award of fees, expenses, and costs, pursuant to the "Litigation Expenses" provision in the agreement.[9] (Doc. Nos. 11, 12).

## II.        APPLICABLE LAW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's claims. *Id.*

In evaluating a motion for summary judgment, the Court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence,

---

[9]        The "Litigation Expenses" clause states: "The parties agree that, in the event litigation relating to this Agreement is filed by either party, the non-prevailing party in such litigation will pay the prevailing party's costs resulting from the litigation, including reasonable attorney's fees." (Doc. No. 11-1 at 14).

judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence from which the jury could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

"[U]nder Tennessee law, which governs this case, contract interpretation is a question of law." [10] *Morsey Constructors LLC v. JMN Rebar LLC*, 448 F. Supp. 3d 812, 816 (M.D. Tenn. 2020) (citing *Ray Bell Constr. Co. v. Tenn.*, 356 S.W.3d 384, 386 (Tenn. 2011)). "[T]he "cardinal rule" of contract interpretation is that courts must interpret contracts to give effect to the intent of the contracting parties consistent with legal principles." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019) (collecting cases).

"The written words" are "the lodestar of contract interpretation." *Id.* at 694. "If the language of the contract is clear and unambiguous, the literal meaning controls the outcome of the dispute … [and] the contract is interpreted according to its plain terms as written, and the language used is taken in its 'plain, ordinary, and popular sense.'" *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704-05 (Tenn. 2008). "The interpretation should be one that gives reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect." *Id.*

---

[10] The parties agree that Tennessee substantive law applies to the Agreement. (*See* Doc. No. 54 at 17; Doc. No. 73 at 3). Tennessee applies the rule of *lex loci contractus*, under which a contract is presumed to be governed by the jurisdiction in which it was executed. *Lampo Group, LLC v. Marriott Hotel Services, Inc.*, No. 3:20-cv-00641, 2021 WL 3490063, a *5 (M.D. Tenn. Aug. 9, 2021).

To determine the parties' intentions, courts may also examine "the circumstances in which the contract was made, and the parties' actions in carrying out the contract." *Boyd v. Martinez*, No. 22-6026, 2023 WL 4903173, at *9 (6th Cir. Aug. 1, 2023) (citing *Individual Healthcare*, 566 S.W.3d at 692). Context is "essential for determining the parties' intent as expressed in the agreement," but "*surrounding facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else.*" *Individual Healthcare*, 566 S.W.3d at 698 (emphasis in original) (quoting *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 765 (Tex. 2018)).

### III.     ANALYSIS

Although the parties have each asserted various theories, the heart of the dispute is whether Avantax properly invoked the force majeure provision in the Agreement. Because the Court finds this issue dispositive, it does not address the parties' alternative theories.

As previously stated, the force majeure clause provides:

> Either party may be excused from performance without liability if circumstances beyond its reasonable control, such as acts of God, war, acts of domestic terrorism, strikes, or similar circumstances, make it illegal or impossible to provide or use the Hotel facilities. The ability to terminate pursuant to this clause is conditioned upon delivery of written notice to the other party setting forth the basis for such termination within ten (10) days after learning of such basis.

(Doc. No. 11-1 at 14). The clause can be reduced to three parts: (1) the existence of circumstances beyond a party's reasonable control, such as acts of God; (2) that those circumstances make is illegal or impossible to provide or use the Hotel facilities; and (3) that the party seeking to terminate pursuant to the clause delivers written notice within ten days after learning of such basis.

Avantax argues its performance under the Agreement is excused by the force majeure provision because the Pandemic qualifies as an act of God and the capacity restrictions in place

made the performance of the contract by both parties illegal or impossible. Avantax asserts that it complied with the ten-day notice requirement by providing written notice setting forth the basis for termination within ten days of receiving the letter from the MPHD indicating that events such as that contemplated in the Agreement would remain capped at 300 people through the event dates.

Defendant appears to concede that the COVID-19 Pandemic is a circumstance beyond the reasonable control of the parties and, therefore, could constitute a force majeure circumstance. It argues, however, that: (1) Avantax's performance is not excused under the force majeure provision because it was not illegal or impossible to "use the hotel facilities" on either the date of performance (June 2021) or the date of termination (March 2021); and (2) Avantax did not give notice of a "qualifying event" within ten days after learning of the basis for termination.

## A. Measuring Date

As an initial matter, the parties disagree about the appropriate measuring date for determining illegality or impossibility. Is it the date of expected performance or the date of termination? The Hotel argues that the measuring date is the date of performance. By that date, all capacity restrictions were lifted. Therefore, if the Hotel is correct and the determination of illegality or impossibility is determined based on the date of performance, performance is not excused under the force majeure clause.

Not surprisingly, Avantax disagrees that illegality or impossibility should be determined based on the date of performance. Instead, Avantax contends illegality or impossibility must be measured based upon the facts that existed at the time of the termination. The Court believes Avantax has the better argument. Otherwise, the force majeure clause would require the parties to "wait and see" if the Hotel facilities were actually provided or useable on the event date before

14

seeking termination even if the source of the illegality or impossibility is known in advance of the performance date. This is particularly untenable under the circumstances of this agreement – a large event that the parties agree typically requires months or more of planning – and this force majeure event – the pandemic.  An interpretation that would requiring the parties to wait until the eve of the event (maybe later) to declare that provision or use of Hotel facilities is illegal or impossible is not supported by overall purpose and intent of the Agreement.

The Hotel points to a decision from a Georgia court that considered a similar Pandemic-related event cancellation – *Insight Global v. Marriott Int'l, Inc*., No. 21-GSBC-0017, 2022 WL 2965497 (Ga. Bus. Ct., June 8, 2022)). In *Insight Global*, the plaintiff cancelled an agreement for an event to be held in Florida six months before the scheduled event. *Id*. at \*17. The court recognized that "the pandemic has seemingly created a perpetual state of uncertainty," but held that uncertainty did not justify the assumption that regulations would remain in place in six months, particularly when Florida's executive orders remained in effect for 60 days at a time. *Id*. The court concluded that "under the circumstances presented, … the measuring date for determining impossibility of performance in *force majeure* cases where a party terminates the agreement before performance is due must be the date of performance, not the date of termination." *Id*. at \*18.

For the reasons already stated, the Court is not persuaded by the *Insight Global* court's conclusion. In any event, the circumstances here are distinguishable. Unlike the Florida orders at issue in *Insight Global*, the MPHD orders in place at the time of the termination stated that they "shall remain in effect until [] rescinded, superseded, or amended." (*See* MPHD Order 12 and 13, Doc. No. 59-14, 59-15)  In addition, the March 10 Letter providing "reopening plans and guidance

for the second half of 2021" stated that MPHD expected the restrictions to remain in place through July 2021 – after the Avantax event.

Under these circumstances, particularly given the "perpetual state of uncertainty" during the pandemic, the Court finds that the whether the force majeure clause is properly invoked is measured based upon the facts that existed at the time of the termination.

## B. Illegality or Impossibility

It is apparent that the event contemplated by the Agreement could not be held under the COVID-19 restrictions in place on March 25, 2021. The Hotel conceded as much in its answer to the Amended Complaint in which it admitted its representatives told Avantax that "if the restrictions remained unchanged over the event dates, the event could not go forward as contracted." (*See* Am. Answer, Doc. No. 37 at ¶ 37). Indeed, under the capacity restrictions at the time, even a 500-person event would have required splitting some functions into multiple rooms. (*See* Resp. to Avantax SUMF, Doc. No. 74 at ¶ 89).

The Hotel argues that the force majeure provision nevertheless does not apply because the Hotel was open for business and, even if it could not hold the Avantax event as contemplated in the Agreement, it was not "illegal or impossible to provide or use the Hotel facilities," and it was never "illegal or impossible" to hold the event for 1,200 people – Avantax would have just had to "be flexible and split some functions into smaller groups." (Doc. No. 57 at 14-15, n.11). In other words, the Hotel argues that because its facilities could be "used" in some manner, albeit not as contracted, the force majeure provision does not apply.

In construing any provision of a contract, the Court's goal is to "give effect to the intent of the contracting parties." *Individual Healthcare*, 566 S.W.3d at 688. In so doing, the Court does not

16

examine the provision at issue in isolation, but in the context of the parties' agreement as a whole. *Maggart*, 259 S.W.3d at 704-05 (Tenn. 2008) (the interpretation should give "reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect").

The Hotel's hyper technical reading of the force majeure provision does not reflect the parties' intent, which was that the Hotel would host the event described in the Agreement. A more reasonable reading of the provision – one that gives effect to the parties' intent as reflected in the Agreement as a whole – is that the force majeure provision is applicable if circumstances beyond either parties' reasonable control make it illegal or impossible to provide or use the Hotel facilities as contemplated in the Agreement.

## C. Written Notice

The notice requirement of the force majeure clause requires that the party seeking to terminate "based on circumstances beyond its reasonable control" that make it "illegal or impossible to provide or use the Hotel facilities" provide "written notice to the other party setting forth the basis for such termination within ten (10) days after learning of such basis." (Doc. No. 11-1 at 14). Avantax contends it complied with this condition by providing written notice within ten days of its receipt of the March 10 Letter.

Recognizing that the perpetual uncertainty of the COVID regulations made it difficult to accurately predict whether the regulations would remain in place in June 2021, Avantax argues that three events in March 2021 forecasted with reasonable certainty that the restrictions would remain in place through the event dates. On March 11, 2021, the Metropolitan Board of Health voted to extend the declaration of public health emergency through June 30, 2021. (*See* Doc. Nos.

17

53-9, 53-10). It was this declaration that gave the MPHD authority to enact, revise, and enforce the restrictions at issue. Further, both Order 12G, which was in place when Avantax cancelled, and Order 13, which went into effect the day after Avantax cancelled, were in effect until "rescinded, superseded, or amended." (*See* Order 12G, Doc. No. 53-11; Order 13, Doc. No. 53-12).

Of course, these orders were subject to revision at any time and were regularly being updated. Avantax acknowledges as much and asserts that the March 10 Letter, "which provid[ed] guidance into the summer on event capacity," was the first concrete indication that the restrictions were not expected to be lifted before the event dates. (*See* Doc. No. 53-17 at PageID# 1053, 1059 (email from Hotel forwarding an email from the Nashville Convention & Visitors Corp. and the March 10 Letter)). Avantax contends the information in the March 10 Letter, together with the extension of the public health emergency, and the revised regulations, provided "sufficient certainty" that the restrictions would extend through the event dates and formed the "basis for the termination."

Marriott contends there was never an appropriate time to invoke the force majeure provision. (Doc. No. 73 at 13-15). It argues that the onset of the pandemic and associated restrictions occurred "well-outside the timeframe of the ten-day notice requirement" and that "these events in March 2020 could not qualify as a 'triggering event' to invoke the force majeure, because neither the pandemic nor related restrictions occurring in March 2020 made it illegal or impossible to provide or use the Hotel's facilities in June 2021." (*Id*. at 13-14). By March 2021, the restrictions, including those discussed in the March 10 Letter, had been in place "for months." Therefore, Marriott argues, even if the restrictions did make it illegal or impossible to use the Hotel facilities, at that point notice was too late. (*Id*. at 14).

18

So, when was the appropriate time to invoke the force majeure provision? According to the Hotel, never. "[T]here was no such appropriate time." (*Id*. at 14). Therefore, the Hotel contends, the notice condition was not met, and Avantax's claim fails as a matter of law. (*Id*.).

The Hotel's argument that it was simply not possible to comply with the ten-day notice provision under the circumstances is not well taken. Indeed, the Hotel's proposed interpretation would effectively nullify the entire force majeure clause.

The Court finds Avantax met the notice requirement. Notwithstanding the fact that pandemic-related restrictions had been in place for some time, it was not until it received the March 10 Letter that Avantax had reasonable certainty that the restrictions would continue beyond the date of the event. As stated in the termination letter, the "basis for termination" was the Metro Public Health Department letter stating that, although restrictions would gradually be lifted as the vaccination rate improved, they were expected to remain in place through July 1, 2021.

Moreover, the happening of circumstances beyond a party's control and the learning of a basis for termination may not be the same date. For example, considering a more traditional "act of God" circumstance, such a severe storm damage – if the damage occurred significantly in advance of the scheduled event and it was believed that the property could be repaired in time, the occurrence of such damage might not give rise to grounds for termination under the force majeure clause. But once it becomes evident that the repairs cannot be completed in time, a party has then "learned of the basis for termination."

Applying this admittedly imperfect analogy to the circumstances of the pandemic (which were even more unpredictable than a post-disaster construction schedule), the pandemic restrictions were known but expected (and hoped) to be lifted in time for the event. The March 10

19

Letter informed the parties to a reasonable degree of certainty that the restrictions would remain in place through the dates of the event. This is the date at which Avantax learned the basis for termination. Therefore, the notice provided to the Hotel within 10 days of Avantax's receipt of the letter was timely.

In summary, the Court finds that Avantax's reliance on the force majeure provision of the Agreement was valid. In reaching this conclusion the Court did not reach the issue of the enforceability of the liquidated damages provision. Accordingly, the objections to the testimony of Michael McDonnell on that issue (Doc. No. 76) are **MOOT**.

## IV.  MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Avantax moves for sanctions for spoliation of evidence under Federal Rule of Civil Procedure 37(e) based, in part, on Marriott's failure to implement a document hold for 15 of 17 identified custodians until November 2022 – more than a year after this lawsuit was filed, and a full year after Marriott's outside counsel first sent a litigation hold letter.[11] (Doc. No. 48; and Doc. No. 49 (citing Harward Dep., Doc. No. 48-4)). At that point, emails that had not been voluntarily preserved by individual custodians had been automatically deleted pursuant to Marriott's one-year document retention policy. (Harward Dep., Doc. No. 48-4 at 16-20). In addition to the issues with electronic document preservation, Avantax points to other discovery shortcomings that were addressed by Magistrate Judge Holmes in a September 28, 2022 Order granting Avantax's motion to compel. (Doc. No. 42). Avantax seeks negative inferences as to all disputed factual matters, or,

---

[11]  Although Marriott's outside counsel sent a document hold letter in November 2021, Marriott did not implement the hold for any of the custodians until January 2022. (Harward Dep., Doc. No. 48-4 at 52-56).

in the alternative, evidentiary sanctions against Marriott, and attorneys' fees associated with the motion for sanctions and the previous motion to compel.

Marriott argues sanctions are not warranted because there is no evidence that any discovery not available from another source was destroyed or, if it did exist, that it would have been relevant to any factual issues in dispute. (Doc. No. 67). Marriott also argues Avantax has not shown it intended to deprive Avantax of any evidence, which is a required showing for an adverse inference under Rule 37(e). (*Id.*).

In light of the disposition of the motions for summary judgment, which the Court reached without adverse inferences, there is no reason to reach the question of whether Marriott intentionally deprived Avantax of relevant discovery. However, the Court finds an award of attorneys' fees is appropriate under Rule 37(a) and (e) and will **GRANT** that aspect of the motion.[12] Otherwise, the motion for sanctions of adverse inferences as to disputed factual matters or other evidentiary sanctions (Doc. No. 48) is **DENIED as MOOT**.

## V.      CONCLUSION

For the reasons stated above, the Court finds that Avantax's reliance on the force majeure provision of the Agreement was valid. Accordingly, Avantax's Motion for Summary Judgment (Doc. No. 53) will be **GRANTED**, and the Hotel's Motion for Summary Judgment for its counterclaim for breach of contract (Doc. No. 56) will be **DENIED**.

The objections to the testimony of Michael McDonnell (Doc. No. 76) are **MOOT**.

---

[12]     The award of attorney's fees under Rule 37 is also of little consequence given "Litigation Expenses" provision in the Agreement, which requires the non-prevailing party to pay the prevailing party's litigation costs, including reasonable attorneys' fees. (Doc. No. 11-1 at 14).

21

The Motion for Sanctions for Spoliation of Evidence (Doc. No. 48) is **GRANTED** as to the request for attorneys' fees, and **DENIED** as moot with regard to the request for adverse inferences or evidentiary sanctions.

Under the plain terms of the Agreement, Avantax, as prevailing party, is entitled to "costs resulting from the litigation, including reasonable attorneys' fees." Avantax may file a motion for attorneys' fees and costs as set forth in Local Rule 54.01.

An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE